**UNITED STATES of America**

v.

**William Joseph KUNTZ and William Martin Bunkis.**

**No. 67–CR–13.**

United States District Court
N. D. New York.

March 17, 1967.

Justin J. Mahoney, U. S. Atty., Albany, N. Y., for plaintiff, George B. Burke, Asst. U. S. Atty., of counsel.

Paul E. Cheeseman, Albany, N. Y., for defendant, William Joseph Kuntz.

Milton E. Berman, Albany, N. Y., for defendant, William Martin Bunkis.

*Memorandum–Decision and Order*

JAMES T. FOLEY, Chief Judge.

The defendants are indicted jointly in two counts for the Armed Robbery of the Queensbury Branch of the First National Bank of Glen Falls, New York, on January 4, 1967, and allegedly taking from its employees that morning the sum of ninety-nine thousand dollars ($99,000.00) at gunpoint. 18 U.S.C. § 2113 (a), (d). Their assigned lawyers under the Criminal Justice Act, in separate motions pursuant to Rule 41 (e) of the Federal Rules of Criminal Procedure, seek return and/or suppression of described items for use as evidence at a trial, claiming such were taken from an automobile in which both were riding on January 4, 1967, when stopped by police officers in the Town of Luzerne, N. Y., by an unlawful search and seizure violative of the Fourth Amendment of the Federal Constitution. The items sought to be returned or suppressed are listed in the motion papers as:

"$99,000.00 United States currency; a suitcase; men's suits, shirts and ties; a .32 caliber automatic gun; men's gloves; certain silk stockings; a key; adhesive tape and tape holder."

It seems self-evident the great amount of cash money would ordinarily appear to be a fruit of the charged crime, being the approximate amount stolen from the Bank. The other paraphernalia, on its face, ostensibly would be useful to rob a bank, if one were so inclined. However, no matter the irony, substantial principles of constitutional law must be canvassed that courts know are troublesome to apply in particular situations. The right to invoke the challenge is the duty of the defense attorneys, and such has been done in able fashion by them. An evidentiary hearing was held on February 19, 1967, and the incidents concerning the robbery, apprehension, arrest, search and seizure were fully developed by a number of witnesses at the hearing. Defendant, Kuntz, the operator of the car from which the above items were taken by law enforcement officers, testified. This is a rare occurrence in hearings of this type, in my experience.

■ Facts concerning criminal ventures unfortunately, at times, do have a fascination. The ones here are particularly intriguing as told by the several witnesses. In this complex area of unreasonable search and seizure, where hairline distinctions at times seem to govern to the dismay of many, one thing is settled. The surrounding facts and circumstances must be penetrated and weighed for legal conclusion by the Court to decide whether or not the requirements imposed for search and seizure that assuredly we all want to be upheld in this country as constitutional safeguards of the highest importance have been complied with by the law enforcement officers. Particularly appropriate to weigh upon the operative facts here is the recent writing of the United States Supreme Court, first emphasizing that it was made clear in the Preston case (Preston v. United States, 376 U.S. 364, 366–367, 84 S.Ct. 881, 11 L.Ed.2d 777) that whether a search or seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case. Further, it is pointed out in particular that searches of cars that are constantly movable may make the search of a car without a warrant a reasonable one, although the result might be the opposite in the search of a home, a store, or other fixed pieces of property. (Cooper v. State of California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 decided 2/20/67; see also Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543; United States v. Francolino, 2 Cir., 367 F.2d 1013, 1018).

To generalize first the facts: The Bank was held up shortly before 8:30 A.M. on January 4, 1967. The employees of the Bank testified there were two men in the hold-up, wearing business suits, white shirts and ties, and having their faces covered with silk stockings which distorted their facial appearance. Understandably, the employees, immediately after the robbery gave varied descriptions to law enforcement officers of their height, age, and so forth, as they recalled. After these first interviews at about 0840 A.M., these physical descriptions went out on the radio nets and teletypes from the Warren County Sheriff's Office with definite alarm two armed males had held up the Bank. As reported by Bank Teller LaBarge, the hold-up men drove away from the Bank in his 1965 brown Chevrolet with black top, License FG-759 that he had parked twenty feet from the bank doors in its parking lot. The exact description of the get-away car was also put out to all radio cars in the area. It was LaBarge who unlocked the door of the Bank with supplies in his hands to let two girl tellers in with him when the two males who were already inside perpetrated the robbery.

Then the critical events for concern here took place. Chief Fitzgerald of the Town of Luzerne, eighteen miles from the robbery, was alerted by the radio messages, and alone with a shotgun immediately took station at a main intersection in the town and began stopping cars to check operators' licenses and registrations. His purpose, of course, was to apprehend the bank robbers. Upon his call for assistance, he was joined within a short time by Officer Mohl of the Corinth Police Department, and they began checking alternately the cars in the traffic. Chief Fitzgerald told Mohl of the crime, that they were looking for two men and described the type Chevrolet they used to get away from the Bank.

At this place of destiny in the little Town of Luzerne, with both officers armed with loaded shotguns, along came the Alfa Romeo sports car driven by Defendant Kuntz, about 9:20 A.M. It was entirely different from the Chevrolet, of course, a point strongly contended as a dominant issue by the defense, being white with black convertible roof, bearing License 6X-9442, and having a pair of skis annexed to the rear. The defendant Kuntz, to all outward appearances, was driving and alone in it. He was wearing a plaid flannel sport shirt, white dungarees, white jacket length car coat and white cowboy type hat. He was stopped and approached and asked for his license and registration. He got out of the car, produced his driver's license, but could produce no current 1967 registration for the Alfa Romeo. During conversations with one or both officers at times, Kuntz produced three other registrations for two pick-up trucks and an automobile, none in his name. The conversations with Mohl alone and then with the officers covered, as estimated by the witnesses, fifteen to twenty-five minutes. There was a lot of moving around from the sports car to the Chief's car back and forth. At one juncture, while Kuntz was looking in the glove compartment searching still, it appeared, for the 1967 registration, he moved a ski jacket in the relatively small front seat area that was covering a suitcase on the floor.

Then highly important incidents, fast-moving and tense, I am sure, began to transpire. There is some variance in the retelling as to these crucial facts as related by Chief Fitzgerald, Officer Mohl and Kuntz, but not as much as might be expected. Kuntz testified Mohl, with a loaded shotgun cradled in his arms, later during their conversations when the suitcase was observed and they were alongside the car, in a loud demanding voice said: "I want to see what is in that suitcase." Kuntz said Mohl brought the gun up, Kuntz offered the suitcase to Mohl, and Mohl said, pointing the gun at him: "You open it." The suitcase was placed on the hood of the car by Kuntz, and the hoard of cash money revealed when opened. Chief Fitzgerald

and Mohl related it a little differently. Chief Fitzgerald said Kuntz removed the suitcase, offered it to Officer Mohl, saying: "Here you are, Buddy, it is all yours." Mohl said: "It is not mine. You put it on the hood and open it." Then, Chief Fitzgerald testified, as Kuntz snapped the latches of the suitcase Kuntz said: "I am your man." Chief Fitzgerald denies Mohl pointed a shotgun at Kuntz, and says both Mohl's and his shotguns were pointed at the ground when the suitcase removal from the car by Kuntz and the opening episode occurred. Thereafter, and it seems undisputed, Kuntz was then arrested and handcuffed, hands behind his back, and became evasive about his accomplice. The officers were some feet from the car and then going to search it further when Kuntz finally said, so no one would get hurt, he would go back to the car and talk his confederate Bunkis out of the rear of the car where he had been lying concealed by clothes. This is what happened. After Bunkis came out of the rear of the car, the officers then searched and found the Italian Biretta revolver cocked with six rounds in it, but none in the chamber. The other articles, I believe outside the money, listed in the motions for return or suppression, were then discovered.

In reference to the illusory concept of reasonable and probable cause, a vital element in these problems, Officer Mohl had no hesitation to answer at the hearing that he became suspicious five minutes after he stopped Kuntz. The thoughts in his mind—to be evaluated as those of a trained and professional police officer—that he said impelled caution and alertness were the corner of the suitcase protruding out, the production of three registrations of other persons and none for the car he was driving, and the tendency of Kuntz to be a little over-polite and a little too cooperative. Mohl remarked in elaboration that this mood or attitude of politeness and cooperation is not commonplace when our people are stopped for these registration and license checks.

I would suspect and fear the point made is a valid one.

It may be very difficult for some to appreciate that under these circumstances just set forth there is depth and substance to the problem of unreasonable search and seizure. However, that is so and a myriad of legal principles and ruling case law must be reviewed for their impact and consequence upon the particular facts here. The threshold question, of course, is whether there was a search at all in the literal sense and if so, were the acts of search and production and opening of the suitcase by Kuntz voluntary and in effect a waiver of these prized constitutional guarantees. (See United States v. Jankowski, 2 Cir., 28 F.2d 800, 802).

 Consent to justify search and seizure without warrant has been a controversial element in the law and difficult to tie down for specific situations. The burden of proof has been clearly and continuously placed upon the prosecution in motions of this kind to show consent. Waiver and consent must be proved by clear and positive testimony and it must be established there was no duress or compulsion, actual or implied. (Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654; United States v. Gross, (SDNY), 137 F.Supp. 244, 247; Judd v. United States, 89 U.S.App.D.C. 64, 190 F.2d 649, 651; United States v. Page, 9 Cir., 302 F.2d 81, 83–84). I am prepared to find, and it is a disputable deduction, that there was consent by Kuntz to produce the suitcase on his own. I think the voluntariness is evident and was stimulated because he knew the jig was up, and he had reached the end of the line. The conversations and contact between him and the police officers, as told by all, after the car was stopped, indicate almost friendly, or at least courteous, relationship, during the questioning about license and registration. I accept the version and recollection of Mohl that when asked what was in the suitcase Kuntz' answer was clothing, and that the request of Mohl to Kuntz in regard to the

suitcase was: Would he mind opening it? Of course, the officers had guns, but the impression I receive is their presence was no more foreboding at the end than at the beginning, and the acts of Kuntz and his final declaration about the suitcase and himself were voluntary and spontaneous. There was cross-examination and there is briefing on the failure to warn under the new guidelines of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, but in my judgment these circumstances do not fit under that authority because the cautions there that are mandatory now relate to in-custodial interrogation. (pgs. 441, 456–458, 86 S.Ct. 1602, 16 L.Ed.2d 694). It is stated therein that generally on-the-scene questioning is not affected and volunteered statements of any kind are not covered by the Fifth Amendment. (pgs. 477–478, 86 S.Ct. 1602, 16 L.Ed.2d 694). Further, there is little question at all in my judgment that the follow-up search that produced the pistol and other items in the back of the car covered over and concealed, with Bunkis crouching there, are ones under the facts here definitely obtained by consent and no illegal search. It was written in United States v. Gorman, 2 Cir., 355 F.2d 151, 158–159, that although consent to search is not to be lightly inferred, where no force or deception is either used or threatened an expression or indication of consent should not be disregarded simply because efficient and lawful investigation has produced a situation where a defendant could hardly avoid giving it. I think that is the exact situation here.

If there was a search by compulsion or by direct acts of the police officers, the next questions are whether there was a legal search incident to a lawful arrest which legalized it, and if so, when did the arrest occur? In Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134, relied on by the defendants a great deal, it was conceded by the government that the arrest occurred when the federal agents stopped the car, although Justice Clark persuasively dissented with remark that this concession was mistaken and erroneous. In the State of New York, however, there is a statute that allows police officers to stop automobiles for license and registration check, and it has been ruled there is clear right for police officers to demand production of the driver's license and auto registration. United States ex rel. Farrugia v. Bhono, (SDNY), 256 F.Supp. 391, 393; New York Vehicle & Traffic Law, McKinney's Consol. Laws, c. 71, Section 401(4). It should be noted that in Ker v. State of California, 374 U.S. 23, 34, 83 S.Ct. 1623, 10 L.Ed.2d 726, the United States Supreme Court stated Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, implied no total obliteration of state laws relating to arrests and searches in favor of federal law.

However, whether the arrest came before or after the removal of the suitcase I think the search and seizure, even if construed as being done or forced by the police officers, was sufficiently contemporaneous with the arrest so as not to invalidate it. (United States ex rel. Wilson v. LaVallee, (NDNY), 251 F.Supp. 292; aff'd 2 Cir., 367 F.2d 351). In the Wilson case I cited the authorities on that point and answered therein a contention that the descriptions of the hold-up men put out on a radio net also were not accurate enough to lend probable cause and lawfulness to the later arrest and search and seizure. My viewpoint was—and I think it only common sense—that description and identification by hold-up victims or witnesses cannot be expected to be 100% accurate in these tense situations.

Along the same line, I am not inclined to give much worth to the argument that because the apprehension was made of a car entirely different from that of the get-away car stolen from the Bank employee the foundation for probable cause is greatly weakened, if not entirely dissipated. It is known in law enforcement that switches are made from automobiles to leave a cold trail in crimes of this kind. Criminals possess ingenuity and resourcefulness to an amazing

degree, and are not inept in their planning and implementation of criminal endeavor. Surely, we cannot hedge in police officers with unrealistic and impractical restrictions that would make them inept and hamper their ingenuity to apprehend resourceful criminals. It is agreed—and the police officers in this instance were well trained—the best manner to combat crime efficiently and cope with the shrewdness of the criminal is to educate and train the law enforcement officers not only as to the best methods in that respect, but also to know the constitutional rights to appreciate at all times. However, it could never be a conclusion with any sense that if you did not find the fleeing robbers in the right car the apprehension did not count and should be forgotten.

The principles judicially formulated over many years are not that unrealistic in regard to search and seizure. The FBI has lived and abided by them with creditable performance. In a leading case of the Supreme Court the approved approach is described and recognized in dealing with probable cause to be that we deal always with probabilities and must search for the practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. (Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879).

Greater flexibility is given to the tests to be applied and factors to be weighed in automobile searches. The Courts have been sensible about this difference. Considered and correct on-the-spot determinations by police officers are not a rigid, unqualified requirement. (See Preston v. United States, supra; United States v. Francolino, supra; United States v. Troiano, 3 Cir., 365 F.2d 416).

In a very recent case with quite similar circumstances involving an armed bank robbery the Court of Appeals, Second Circuit, wrote this statement clearly applicable here:

"Under the circumstances of this case it was more important to make the search at once in order to pursue effectively and promptly the necessary investigation into the details of the robbery, the existence of collaborators or accomplices and the identity of witnesses. It was also proper to attempt to find at the earliest possible moment the pistol used in the hold-up." United States v. Doyle, 2 Cir., 373 F.2d 875, decided February 28, 1967).

■ If probable cause, an elusive concept, must be determined here, I think the fact of armed robbery itself, known to the police officers as having occurred in the near vicinity, the alarm to the police with descriptions and warnings, the obvious conclusion the robbers would be fleeing the scene of the crime and the area, the specific acts and conduct of Kuntz and his resemblance somewhat to the broadcast physical description of one of the robbers, and his failure to produce the proper registration give adequate support for probable cause to arrest lawfully and search. None know how other minds work, particularly when the other is differently trained, but these factors are reasonable, in my judgment, to accept as a proper base for the quick conclusion that had to be made by police officers who knew they might at any moment be exposed to the danger of being shot.

Each of the separate motions for the two defendants under Rule 41(e) is denied in its entirety and dismissed, and it is

So Ordered.