629 So.2d 238 (1993)
Jerry SCOTT, Appellant,
v.
The STATE of Florida, Appellee.
No. 92-2569.
District Court of Appeal of Florida, Third District.
December 14, 1993.
*239 Bennett H. Brummer, Public Defender, and Juan C. Enjamio and Walfrido J. Martinez, Sp. Asst. Public Defenders, for appellant.
Robert A. Butterworth, Atty. Gen., and Francine Thomas and Daisy Guell, Asst. Attys. Gen., for appellee.
Before SCHWARTZ, C.J., and NESBITT and GODERICH, JJ.
SCHWARTZ, Chief Judge.
We affirm Scott's convictions for armed robbery and theft.

I.
The police were called to the scene soon after Mr. Moore noticed two strangers, carrying a firearm and some packages, in his neighbor's backyard. An officer chased the apparent miscreants but lost them when they entered a housing development nearby. Other officers then established a "perimeter" around the complex in an attempt to apprehend the perpetrators.[1] A few minutes later, Scott  wearing clothes different from those worn by either person involved in the crime and chase  walked from the apartment area and was stopped by the police.[2] A computer *240 check showed an outstanding warrant and he was arrested on it. The ensuing search of his person revealed coins and other objects which had been taken from the neighbor's house.
We reject the appellant's contention that the stop and thus the consequent arrest and search were constitutionally unauthorized. Although there was no individualized "founded suspicion" of Scott's guilt so as to justify a Terry stop, the practice employed here of stopping all persons in the immediate vicinity of a known crime was a reasonable law enforcement activity which is not barred by the Fourth Amendment. As was said in United States v. Harper, 617 F.2d 35, 40-41 (4th Cir.), cert. denied, 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980), distinguishing Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979):
In Prouse the Supreme Court was concerned with random stops of vehicles made at the will and whim of officers in the field, where the officers have no reason to stop any particular vehicle, other than for general police surveillance.
Here, the problem is very different. The purpose of these stops was to arrest suspects for a known crime, not to discover evidence of undetected crimes by the happenstance of visual searches. A serious crime had been committed involving numerous participants, some of whom were known to be fleeing the scene along a route reasonably expected to be used for their escape. Stopping all cars there was, under such circumstances, a necessary means of law enforcement, and as such, justifies the minimal intrusion on privacy rights posed to passing motorists.
The Fourth Amendment does not create barriers to reasonable law enforcement activities in the area of a detected crime.
The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, [Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)] recognizes that it may be the essence of good police work to adopt an intermediate response.

Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). By virtue of the exigency of fleeing, perhaps dangerous, suspects, we think the stops of all persons found on a likely access route to [or from] the scene of the crime was reasonable, both in its purpose and in the manner it was conducted. See United States v. Constantine, 567 F.2d 266 (4th Cir.1977), cert. denied, 435 U.S. 926, 98 S.Ct. 1492, 55 L.Ed.2d 520 (1978); United States v. Jackson, 448 F.2d 963 (9th Cir.1971).
Accord, e.g., United States v. O'Mara, 963 F.2d 1288 (9th Cir.1992); Perry v. State, 422 So.2d 957 (Fla. 3d DCA 1982); 3 Wayne R. LaFave, Search & Seizure § 9.5(a) (2d ed. 1987). See generally Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990).
Since it was thus appropriate to stop everyone coming from the area in question, it does not matter that Scott was dressed differently when he was apprehended. As LaFave says:

*241 This is not to suggest, however, that a roadblock would be inappropriate whenever a specific vehicle description is at hand. In a bank robbery case, for example, the availability of a description of the auto in which the robbers fled should not limit the police to investigation of vehicles of that type, for it "is known in law enforcement that switches are made from automobiles to leave a cold trail in crimes of this kind." United States v. Kuntz, 265 F. Supp. 543 (N.D.N.Y. 1967).[3]
3 LaFave, Search & Seizure § 9.5(a), at 551.

II.
Scott also correctly complains that the showup process in which he was presented to Moore, who had originally seen the men near the scene of the crime, was unduly suggestive in the extreme, so that his out-of-court identification should have been suppressed. See State v. Sepulvado, 362 So.2d 324 (Fla. 2d DCA 1978), cert. denied, 368 So.2d 1374 (Fla. 1979).[4] Nevertheless, we do not reverse on this ground. This is because we find no error in the trial judge's ultimate conclusion that, under all the circumstances, the out-of-court identification did not taint Moore's in -court identification of the defendant. See United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Edwards v. State, 538 So.2d 440 (Fla. 1989); Lecoin v. State, 418 So.2d 336 (Fla. 3d DCA 1982). In these circumstances, particularly in the light of the fact that stolen property was found on Scott's person, the admission of the out-of-court identification is properly regarded as merely harmless error. See McKenney v. State, 529 So.2d 367 (Fla. 1st DCA 1988). See generally State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
Affirmed.
NOTES
[1] The officers stated:

Q. Tell us now, Officer, what is the next thing that you do when you lose sight of these individuals that you're chasing?
A. As I'm chasing these suspects I'm speaking to other units via the radio. We established a perimeter telling them when they entered Strawberry Fields, and asked the units to set up around that area.
Q. What is a perimeter?
A. We know we have suspects within an area, we wanted units to contain those suspects, all the points of exit to surround that particular area immediately so that they can't get through.
We know we have them inside there and we send in canine, which are dogs, to track those particular individuals.
Q. So according to your testimony, during the course of the perimeter people who are inside the perimeter are not able to go out; is that correct?
A. No, they are not.
Q. Is anybody able to enter through the perimeter?
A. No, they are not. Everybody is identified. If you live there then we will just ask you to be patient, we are working a perimeter here. We have suspects inside that could be dangerous, and just ask the public to just be patient until everything is finished.
* * * * * *
When the call went out I took up position at this intersection right here. My car was facing south. There was a marked uniform patrol car with an officer parked in this direction facing west. And all along, and all around this wooded area we had other marked units surrounding this whole area.
Q. As far as your understanding, Officer, was the entire area sealed off?
A. The entire area was sealed off immediately including a marked unit that was on the south bank of this canal at the foot bridge.
Q. Is it at that time that the perimeter is completely sealed?
A. The perimeter is completely sealed based on Officer Ingram's communication on the radio frequency, that she was in pursuit of two individuals right in this general vicinity of Southwest 122nd Avenue by the guard rail here.
* * * * * *
Q. Could anybody come into the perimeter?
A. If you didn't live there, no. We would ask questions first if you lived there, if you were visiting somebody. We would hold back anybody that would come in.
We had established a perimeter, basically, nobody was allowed to go in around.
[2] We set up a perimeter. I was the first unmarked detective with an unmarked vehicle, I positioned myself here.
Q. What is that location right there?
A. Southwest 118th Court and Southwest 210th Street.
Q. Does there come a time that you observe somebody coming from the general area of the vacant house at 12054 Southwest 210 Terrace?
A. Yes. Specifically this is what had taken place. As I set up here two other detectives assisted me, parked their vehicles behind mine. Small X's that I'm marking on here were myself and two other detectives that I work with.
We were basically facing this area looking into the wooden fence, waiting for a helicopter and canine units to respond to the scene to conduct the search.
Marked unit patrol car of Metro-Dade Police Department, green and white, with one officer was positioned here, who had a clear shot of this particular terrace looking west.
Approximately, fifteen to twenty minutes after the initial sighting of the two individuals here and after I had set up a perimeter with the other detectives, I noticed a black male walking from this location here indicating where this mark is. Basically, walking on the right side of this police vehicle from west to east.
He crossed 118th Court, came onto the sidewalk and continued to walk in a northerly direction.
[3] In fact the clothes originally worn by Scott were found in an empty apartment in the complex, where he had obviously left them before attempting to escape.
[4] Among other things, the "presenting" officer informed Moore before the showup that the person in custody was a suspect, that stolen property had been found on him, and that he had changed clothes after he had committed the crime.