UNITED STATES of America,

v.

Gregory Hollis DAVIS.

No. CR. 00–70–E.

United States District Court,
M.D. Alabama,
Eastern Division.

June 18, 2001.

William K. Abell, Shinbaum, Abell, McLeod & Vann, Montgomery, AL, for defendant.

Stephen P. Feaga, U.S. Attorney's Office, Montgomery, AL, for plaintiff.

## ORDER

MYRON H. THOMPSON, District Judge.

The interesting question confronting the court is whether a roadblock, set up beforehand as part of a dragnet to help in the simultaneous arrest of six persons indicted on drug offenses, violated the fourth-amendment rights of a person who was not the object of the roadblock.

On July 12, 2000, defendant Gregory Davis entered a conditional plea of guilty to a two-count indictment alleging possession of methamphetamine with intent to distribute, 21 U.S.C.A. § 841(a)(1), and possession of a firearm in connection with a drug crime, 18 U.S.C.A. § 924(c)(1)(A)(i). The plea was conditional, see Fed.R.Crim.P. 11(a)(2), upon this court's ruling on Davis's objections to United States Magistrate Judge Vanzetta Penn McPherson's recommendation, based on evidence and argument, that his motion to suppress evidence obtained at a roadblock be denied. Before a ruling on these objections was issued, the United States Supreme Court decided *City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), and held that roadblocks set up primarily for narcotics detection. based on general crime-control purposes and not individualized suspicion, violated the fourth amendment. Upon order of this court, the parties briefed and presented additional evidence regarding the application of *Edmond* to the pending suppression motion. Accordingly, this cause is currently before the court on Davis's original objections to the magistrate judge's recommendation and the supplemental grounds for his motion under *Edmond*.[1] For the reasons that follow, the court concludes that the motion is due to be denied because (1) the search of Davis's vehicle was conducted pursuant to a legal roadblock and (2) Davis has failed to establish any other violation of his rights under fourth amendment to the

---

1. The evidence before the court therefore came from two evidentiary hearings, one before the magistrate judge on June 21, 2000, and the second before the undersigned district judge on January 3, 2001.

United States Constitution during the course of the search of his vehicle.

## I.

On March 22, 2000, Davis was stopped at a roadblock set up by an inter-governmental drug enforcement task force that included law enforcement officials from the federal Drug Enforcement Administration ("DEA"), the United States Marshal's Service, the Alabama Bureau of Investigation, the Lee County Sheriff's Department, and the Opelika City Police Department. The roadblock, one of six set up that day in Chambers and Lee Counties, Alabama, was part of a comprehensive operations plan to arrest six of eight individuals named in two federal indictments issued on March 15, 2000.[2] The operations plan called for six "arrest teams" to apprehend these individuals either at their homes or places of employment. The roadblocks served two purposes: (1) to catch any of the six if they were inadvertently in transit at the time of the operation and (2) to prevent escape should any attempt to flee. The operation was set to begin with a briefing at 9:00 a.m.

Davis was not named in the indictments, but he was known to law enforcement officials for his involvement in the production and sale of methamphetamine. At approximately 11:56 a.m., he was stopped at one of the roadblocks. Officer Cameron Siems of the Opelika City Police Department looked inside Davis's vehicle and noticed the handle of a shotgun.[3] With the assistance of a Lee County deputy sheriff, the weapon was secured, and the agents ran a computer check on Davis's driver's license and the serial number of his shotgun.

While Davis was still detained at the roadblock, but before the shotgun had cleared, Siems noticed "one or two propane tanks and some clear plastic tubing" inside the vehicle. Siems had been told to look for these items because they were commonly associated with the manufacture of methamphetamine. By radio, Siems brought this to the attention of his field supervisor, Detective Aris Murphy, who decided to call for narcotics-detection dogs to sniff the vehicle. Davis did not give consent to a search of his vehicle. The narcotics-detection dogs arrived at 12:26 p.m. and upon circling the vehicle did not alert to the odor of drugs. Nonetheless, the officers wanted to search the vehicle because of the propane tank, rubber tubing, lack of consent, and shotgun.

Murphy arrived at the roadblock at approximately 12:42 p.m., when he was informed of the propane tank and tubing, the shotgun, and that officers had seen in plain view two bags containing an off-white powder. Murphy himself observed a black leather jacket folded on the front seat of the vehicle with a white packets protruding from the coat pocket, and the tank and tubing. He did not smell anything in or about the vehicle, but believed that the packets were contraband by the manner in which they were packaged.

Additional DEA agents arrived at the roadblock at approximately 12:45 p.m. and observed the same items Siems and Murphy saw. Deciding sufficient cause existed, they entered the vehicle and conducted a search, finding two clear plastic bags containing a white substance. Later tests confirmed the bags contained methamphetamine. Of the ten to 12 officers at the

---

**2.** Two of the eight were already incarcerated when the indictment was issued.

**3.** Upon inspection of the shotgun, officers noted that it was fitted with a collapsible stock, pistol grip, and laser sight, and was loaded. In the opinion of one officer at the scene, the shotgun, while legal, was equipped for personal protection.

scene when the search was conducted, six were DEA agents trained to detect drugs and investigate drug offenses.

## II.

The court is faced with three questions concerning Davis's motion to suppress: (1) Are roadblocks set up to arrest individuals named in an indictment permissible under the fourth amendment? (2) If so, did the one set up here fall within the permissible bounds of the fourth amendment? (3) If this particular roadblock was constitutional, was there any other aspect of Davis's stop that violated his fourth-amendment rights? The court addresses [to] each of these questions in turn.

### A.

■ Surprisingly, the court has uncovered no cases, federal or state, that have addressed the general question of the constitutionality of roadblocks set up beforehand for the specific purpose of serving as backup road checks in the arrests of indicted persons. This question is more pertinent in the wake of the *Edmond* decision, for lower courts have yet to address in substantial measure the reach of the *Edmond* decision.

In *Edmond*, the checkpoints or roadblocks were conducted pursuant to a written plan under which a predetermined number of vehicles were stopped. Drivers were asked to produce a driver's license and vehicle registration; officers looked for signs of impairment and conducted an open-view examination of vehicles from the outside; and narcotic-detection dogs walked around the outside of the vehicles. *See* 531 U.S. at ——, 121 S.Ct. at 450.

Holding the checkpoints unconstitutional on fourth-amendment grounds, the Supreme Court explained that "when law enforcement authorities pursue primarily general crime control purposes at checkpoints ... stops can only be justified by

some quantum of individualized suspicion." *Id.* at ——, 121 S.Ct. at 457. "[W]here the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes," the Court concluded, "[w]e cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime." *Id.,* 531 U.S. at ——, 121 S.Ct. at 455.

The *Edmond* roadblocks had the primary purpose of "general crime control," not one of the few situations where brief, suspicionless seizures at highway checkpoints have been held legal. In *Michigan Department of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), the Court found sobriety checkpoints aimed at removing drunk drivers from the road justified by the "immediate hazard posed by the presence of drunk drivers on the highways." *Edmond,* 531 U.S. at ——, 121 S.Ct. at 453. And, in *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Court upheld the use of immigration checkpoints within 100 miles of the Mexican border because " 'formidable law enforcement problems' posed by the northbound tide of illegal entrants into the United States" tipped the balance "in favor of the Government's interest in policing the Nation's borders." *Edmond,* 531 U.S. at ——, 121 S.Ct. at 452. The *Edmond* Court went on to suggest that the government's interest in highway safety may also justify driver's license and registration checkpoints, so long as the "primary purpose" of the roadblock was this important state interest, and not general crime control. *See id.*

The primary purpose of the roadblock at which Davis was stopped, to arrest recently indicted individuals, does not fall within these two, possibly three, categories.

Nevertheless, the court finds that this roadblock did not violate the rule set forth in *Edmond.* There is a material difference between general crime control and serving arrest warrants on indicted individuals. The roadblocks in *Edmond* were investigatory in nature, that is, they were little more than a dragnet established by police "to detect evidence of ordinary criminal wrongdoing." *Edmond,* 531 U.S. at ——, 121 S.Ct. at 454. Here, in contrast, law enforcement officials were not attempting to uncover general criminal activity; they were instead attempting to arrest individuals about whom a grand jury had concluded probable cause existed as to their involvement with criminal activity *and* about whom, as the court will explain later, there were special exigent and dangerous circumstances that warranted additional law-enforcement measures. Although the *Edmond* roadblocks, like the arrest roadblocks here, had the "ultimate purpose of arresting those suspected of committing crimes," *id.* at ——, 121 S.Ct. at 454, *Edmond* did not foreclose the possibility that a roadblock could be used where exigent and dangerous circumstances warranted one. For example, *Edmond* recognized that "the Fourth Amendment would almost certainly permit an appropriately tailored roadblock set up" to address such dangerous and exigent circumstances as the need "to thwart an imminent terrorist attack or to catch a dangerous criminal who is likely to flee by way of a particular route." 531 U.S. at ——, 121 S.Ct. at 455. Thus, it follows from these comments that if law enforcement officials have a reasonable articulable basis in fact to believe that an arrest will likely pose dangerous and exigent circumstances and that a roadblock would provide significant help in addressing these circumstances, an appropriately tailored roadblock could pass constitutional muster.

**B.**

The court emphasizes the limited nature of the above conclusion. The court is not saying that all roadblocks set up beforehand to arrest recently indicted individuals are constitutional; instead, it is saying that, depending on the circumstances, they could be.

The appropriate analysis in determining whether an arrest roadblock passes constitutional muster balances "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest and the severity of the interference with individual liberty." *Brown v. Texas,* 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *cf. Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Or, as the Eleventh Circuit Court of Appeals has articulated the *Brown v. Texas* approach, the court must determine whether the instant roadblocks "were reasonable in the light of the state's interest in conducting the roadblocks, the effectiveness of the operation in promoting that interest, and the level of intrusion on the individual's privacy caused by the checkpoints." *Merrett v. Moore,* 58 F.3d 1547, 1551 (11th Cir.1995) (*citing Brown v. Texas,* 443 U.S. at 50–51, 99 S.Ct. at 2640).[4] Thus, the balancing of individual privacy and law-enforcement in-

---

4. Because the court finds the primary purpose of these roadblocks was constitutional, it is not necessary to address the continued validity of the Eleventh Circuit's conclusion in *Merrett v. Moore* that "a state may conduct a mixed-motive roadblock as long as one purpose presented for the roadblock could validly justify the roadblock." 58 F.3d at 1551. *Ed-*

*mond* and *Merrett* appear to differ on this point. While it may be that this part of *Merrett's* holding has been overturned, *Edmond* neither addresses, nor affects, that part of *Merrett's* conclusion that courts should apply the *Brown v. Texas* balancing test to roadblocks. *See* 58 F.3d at 1551–54.

terests is the locus of this court's second question: Is this particular roadblock constitutional?

When police institute a roadblock, they have less evidence that any one stopped vehicle will be occupied by the individual for whom they are searching than they would have if they had probable cause to stop the vehicle absent the roadblock. Consequently, a roadblock can be a blunt and sweeping and yet very intrusive tool that is essentially an exception to the fourth amendment's individualized probable-cause or suspicion-based determination, and thus must be justified by more evidence of a pressing and legitimate public need for it. *See* 4 Wayne R. LaFave, *Search and Seizure* § 9.6(a) (1996). In other words, where probable cause for stopping any one vehicle is lower, the exigent circumstances necessary to justify it—that is, the gravity of public concern—must be greater. As Justice Jackson observed in a Prohibition era case involving the use of cars to transport alcohol:

> "If we assume, for example, that a child is kidnapped and the officers throw a roadblock about the neighborhood and search every outgoing car, it would be a drastic and undiscriminating use of the search. The officers might be unable to show probable cause for searching any particular car. However, I should candidly strive hard to sustain such an action, executed fairly and in good faith, because it might be reasonable to subject travelers to that indignity if it was the only way to save a threatened life and detect a vicious crime. But I should not strain to sustain such a roadblock and universal search to salvage a few bottles of bourbon and catch a bootlegger."

*Brinegar v. United States,* 338 U.S. 160, 183, 69 S.Ct. 1302, 1314, 93 L.Ed. 1879 (1949) (dissent).

Although the Supreme Court has never determined with specificity what degree of danger or exigency justifies a roadblock, cases upholding the constitutionality of roadblocks underscore the importance of a clear presence of dangerous or exigent circumstances, such as the need to protect the community from the danger of individuals fleeing from law enforcement officials or otherwise attempting to avoid arrest. *See, e.g., United States v. Harper,* 617 F.2d 35 (4th Cir.1980) (roadblock after police discovered a large-scale smuggling operation with numerous participants, some of whom were known to be fleeing the scene along a route reasonably expected to be used for their escape); *United States v. Kuntz,* 265 F.Supp. 543 (N.D.N.Y.1967) (roadblock after an armed robbery where general descriptions of the suspects had been broadcast to area officials); *Lacy v. State,* 608 P.2d 19 (Alaska 1980) (roadblock on only road leading from site of an armed rape); *People v. Euctice,* 371 Ill. 159, 20 N.E.2d 83 (1939) (roadblock after murder where suspects were seen fleeing down a particular road); *Perry v. State,* 422 So.2d 957 (Fla.Dist.Ct.App.1982) (roadblock on only road leading off and island after jail break); *State v. Claussen,* 522 N.W.2d 196 (S.D.1994) (roadblock stopping all cars leaving a party where juvenile drinking occurred).

■ Similarly, this case turns on the danger and exigencies presented by the arrests planned by law enforcement officials. Based on the testimony of DEA Agent David Taylor, the official who drafted the operation plan for the arrests and roadblocks, the court is convinced that the roadblocks were appropriate, as part of the overall operation plan in effect, to carry out the arrest of the six indicted individuals then at large. In particular, the court finds the following facts established a reasonable concern on the part of law enforcement officials that these arrests posed a threat to public safety:

(1) Each of the six targeted individuals was indicted for possession, distribution, and conspiracy to distribute methamphetamine. One was also charged with possession of a firearm in connection with drug distribution.

(2) Officers knew that two of the individuals—Reed Black and Scotty Davis—had created dangerous situations in the course of prior arrests. More specifically, Black had been arrested before for methamphetamine production after police surveillance uncovered a methamphetamine laboratory on his property, and, armed with a 12–gauge shotgun, Black had had a confrontation with surveillance officers before he was taken into custody. Scotty Davis had also already been arrested for methamphetamine production, and, more specifically, when police attempted to stop his vehicle during this prior arrest, he led officers on a high-speed chase down dirt roads. His truck eventually flipped, and he was apprehended after attempting to flee on foot. Scotty Davis's vehicle contained a methamphetamine laboratory and a firearm.

(3) Methamphetamine presents a particular threat to public safety because volatile, combustible, and flammable chemicals, including the solvents other and acetone, are often used in its production. For example, when Black was arrested previously he had 50 gallons of other on site next to his trailer, an amount sufficient to cause substantial damage (or as Agent Taylor put it, to "level this city block") if ignited.

(4) Methamphetamine is also unique because the means of production are mobile.

For example, when Scotty Davis was previously arrested, he had with him the components of an entire methamphetamine laboratory. This raised the concern that these individuals would attempt to flee taking their methamphetamine laboratories, and dangerous chemicals, with them in their vehicles. Agent Taylor testified that guns are also often used by persons who engage in the manufacture of methamphetamine.

(5) Officers recognized that defendants lived in a "small," "tightly knit . . . community" raising the concern that word of the arrests would spread quickly, potentially causing unapprehended individuals to flee. With respect to Scotty Davis, this fear was more pronounced in light of his previous attempt to flee arrest. Officials were also concerned that the presence of 75 to 80 police officers and several helicopters in the area for the operation increased the likelihood that someone would become aware of their presence.

In light of these exigent and dangerous circumstances, the roadblocks, as part of an overall plan to apprehend these six individuals, were necessary to meet the government's interests in minimizing the risk to the community and to law enforcement officers.

The arrest roadblocks were also appropriately and narrowly tailored. The plan was to attempt to execute the arrest warrants simultaneously in the locations where the police suspected the six indictees were going to be located.[5] All six roadblocks were located at major intersec-

---

**5.** The record is somewhat thin with regard to the actual timing of the operation. The operation was set to begin at 9:00 a.m. with a briefing; Davis was not stopped at a roadblock until approximately noon. The record does not reflect when the roadblocks began, when the six indictees were arrested or, more importantly, when there was no longer a need for the roadblocks. These factors could have a bearing on the constitutionality of a roadblock like this one. Nevertheless, Davis does not contend that he was stopped after all six individual had been apprehended and after a reasonable time had passed to discontinue the roadblocks.

tions in the vicinity of where the six arrests were to be made. There was therefore a direct connection between the effort to serve the warrants in the establishment of the roadblocks. Roadblocks were not a standard operating procedure to serve arrest warrants; the plan for simultaneous arrests with roadblock back-up was designed specifically for this operation and these individuals. As Officer Taylor put it, the roadblock plan was designed from "scratch."

Again, the limits of this holding bear reiteration. The court does not hold that the arrest of indicted individuals is a government purpose that, in and of itself, justifies the significant interference with individual liberty that is caused by a roadblock. Nor does this court hold that the arrest of every person indicted for a drug-related offense presents a significant threat to public safety. If the court came to either of these two conclusions, the fourth amendment "would be little check on the ability of authorities to construct roadblocks for almost any conceivable law enforcement purpose." *Edmond,* 531 U.S. at ——, 121 S.Ct. at 454. Roadblocks, as stated, are a blunt tool that can significantly infringe on individual liberty with, by definition, little-to-no individualized suspicion of those stopped; their constitutionality should therefore be subject to a rigorous showing of need by the government. Here, the government has articulated specific facts establishing a potential for danger to the community and shown to the court that the steps it took to minimize these risks—establishing roadblocks as part of a comprehensive plan to make arrests—were narrowly and appropriately tailored to meet these risks.

## C.

■ Because Davis was stopped pursuant to a constitutional roadblock, the court must reach the third question: Whether the conduct of officers after Davis was stopped at the roadblock violated his fourth-amendment rights. This question was argued in Davis's original motion to suppress, which was denied by the magistrate judge. Upon consideration of Davis's objection to the magistrate judge's recommendation, and after an independent review of the file, the court adopts the recommendation of the magistrate judge with the following comments and modifications.

In his objection, Davis challenges several factual determinations made by the magistrate judge with respect to the chronology of events during the approximately one hour Davis was held prior to the search of his vehicle and arrest. Further, he contends that, under his version of events, the officers did not have requisite cause to search his vehicle, thus violating his fourth-amendment rights.

Davis's chronology is not supported by the record; the magistrate judge's, with one exception, is. Davis claims that the videotape of the search, taken from a police cruiser at the scene, indicates that the shotgun found in his vehicle was cleared at 12:01 p.m., about five minutes after the stop. Although the precise time the gun registration check was completed is not clear from the tape, the magistrate judge was correct to conclude that it did not occur until after the narcotic-detection dogs failed to alert on the drugs—sometime after 12:26 p.m. This confirms the testimony of Officer Siems at the first suppression hearing.

The videotape also confirms Siem's testimony that officers immediately—and in plain view—observed the propane tank and tubing in Davis's truck. Siems testified that he had been specifically instructed to look for these items at the roadblock because they are commonly used in methamphetamine production. Other officers at the scene also knew the tank and tubing could be used in methamphetamine pro-

duction. At 11:59 a.m. and 12:05 p.m., officers discussed the presence of the tubing in Davis's vehicle and, based on this, decided to call in officers more experienced in narcotics interdiction to determine if probable cause existed to search the vehicle. The magistrate judge's factual findings were incorrect with respect to the role of Detective Murphy at this point in the stop. Judge McPherson implies that Murphy visually spotted the clear bags of drugs before the drug-detection dogs arrived at 12:26.[6] However, she finds elsewhere that Murphy did not appear on the videotape until 12:42.[7] This confirms Murphy's testimony that he did not arrive at the scene until 12:42. Though it was impossible for Murphy to have seen the drugs first-hand before 12:42, it appears the magistrate judge based her conclusion that probable cause existed in part on Murphy's discovery of the bags shortly after the stop occurred.[8] It is clear that Murphy's first-hand knowledge could not have contributed to the determination that probable cause existed until after 12:42.

Had the officers at the scene before 12:42 detained Davis after his shotgun cleared only on the basis of the propane tank and tubing, it is possible that this continued detention would have been constitutionally impermissible. *See United States v. Purcell,* 236 F.3d 1274, 1276 (11th Cir.2001) (finding the duration of a stop must "be limited to the time necessary to effectuate the purpose of the stop"); *United States v. Holloman,* 113 F.3d 192, 196

(11th Cir.1997). This is not the case. Murphy testified that when he arrived, he was informed by Captain Weldon and other agents already there that they had made a plain-view identification of bags suspected to contain controlled substances. A photograph taken by a law enforcement officer from outside the truck before the search confirms that the bags would have been visible to anyone who looked inside.

Thus, even though Murphy and the DEA officers did not decide to enter Davis's vehicle until about 12:44, the visual identification of two suspicious packages, the propane tank and tubing, the modified—though legal—shotgun, and Davis's reputation for involvement in the drug trade, provided probable cause well before that time.[9] All this information was ascertained by police *before* the legitimate purpose of checking the gun registration was completed. This justified their continued detention of Davis until Murphy and the DEA agents arrived. The final determination that probable cause existed was made no more than 20 minutes after the shotgun cleared and the dogs failed to alert, and almost immediately after DEA agents arrived on the scene. In total, the magistrate judge was correct to conclude that the officers acted reasonably in detaining Davis, even though he was detained for nearly an hour.

The other factual and legal conclusions in the magistrate's recommendation, which further support her recommendation, are also adopted by the court.[10]

6. *See* Recommendation of the magistrate judge, filed July 7, 2000, at 2.

7. *See id.* at 4.

8. *See* Recommendation of the magistrate judge at 2.

9. The officers originally on the scene chose not to search Davis's truck immediately because they were under instructions to wait for

Murphy, and to wait until the more experienced DEA officers arrived on the scene.

10. Officer Siems stated on cross examination that Davis's refusal to give consent was one factor leading to the officers' determination that probable cause existed for the search. The court notes that an individual's refusal to consent to a search cannot establish probable cause for that search. *See United States v. Alexander,* 835 F.2d 1406, 1409 n. 3 (11th

## III.  CONCLUSION

For the reasons stated above, it is ORDERED as follows:

(1) The recommendation of the magistrate judge, entered July 27, 2000, is adopted.

(2) Defendant Gregory Hollis Davis's motion to suppress, filed June 7, 2000, is denied.

It is further ORDERED that the sentencing of defendant Davis is set for July 10, 2001, at 2:00 p.m.

MTI Investment, Inc, a/k/a MTI, Inc., Cashflow System, Inc., Cashflow, Inc., Amazing Cashflow, Inc., Pre–Foreclosure Bank Owned Properties, Inc., Synchronol, Inc., Herman Venske, Defendants,

Animal Welfare Foundation, Inc., United Parcel Services, Charter Pacific Bank, and C.V. Butler Farms, Inc., Claimants.

Cir.1988).  The magistrate judge's recommendation does not consider this as a factor in her finding that probable cause existed and this court further emphasizes that officers had sufficient probable cause independent of Davis's refusal to give consent.